UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DÈSIRÈE ISABEL LÖVENICH,

        Petitioner,

vs.                                        Case No. 3:14-cv-1265-J-34JBT

CLARENCE VICTOR WASHINGTON,

        Respondent.
_____/

# O R D E R

**THIS CAUSE** is before the Court on Petitioner's Verified Petition for Return of Minor Child to Petitioner and Petition for Immeidate [sic] Issuance of Show Cause Order to Respondent (Doc. 1; Verified Petition), filed on October 17, 2014. Petitioner filed the Verified Petition pursuant to The Convention on the Civil Aspects of International Child Abduction (the Hague Convention or the Convention), Oct. 25, 1980, T.I.A.S. No. 11670, as implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601, et seq.[1] In the Verified Petition, Petitioner Dèsirèe Isabel Lövenich (Lövenich), a citizen and resident of Germany, requests the return of her child, C.V.J.W. (the Child) from the United States to Germany. See Verified Petition at 8. Respondent Clarence Victor Washington (Washington), the father of the Child, filed an answer to the Verified Petition on November 24, 2014. See Respondent's Answer to Verified Petition for Return of Minor Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent (Doc.

---

[1] Recently, ICARA was editorially reclassified as 22 U.S.C. § 9001, et seq. See 42 U.S.C. § 11601.

16; Answer). Washington and the Child are currently residing in Jacksonville, Florida.[2] On November 25, 2014, the Court held a status conference and, after conferring with the parties, set this matter for an evidentiary hearing on February 24, 2015. See Minute Entry (Doc. 17). However, due to logistical problems, and in order to obtain Lövenich's presence at the hearing in person, the Court found it necessary to reschedule the evidentiary hearing for May 27, 2015. See Minute Entry (Doc. 28), filed February 20, 2015. The Court held the evidentiary hearing on May 27, 2015, as scheduled and both parties appeared with their counsel. See Minute Entry (Doc. 37; Hearing). The Court heard testimony from the parties, as well as Betty Mays, Washington's sister, and accepted several documents into evidence. Id. Counsel for the parties submitted trial briefs prior to the Hearing, and following the Hearing, counsel elected to waive the submission of any oral or written closing arguments. See Petitioner's Trial Brief (Doc. 27), filed February 18, 2015; Respondent's Trial Brief (Doc. 32), filed April 14, 2015. Accordingly, this matter is ripe for review.

## I.   Prima Facie Case

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." See Convention, pmbl. "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more

---

[2] On November 4, 2014, Washington filed an Acceptance of Service of Process (Doc. 11). The Court held a hearing on November 5, 2014, at which both parties were represented by counsel. See Minute Entry (Doc. 13). With the consent of the parties, and pursuant to this Court's authority under 22 U.S.C. § 9004(a), the Court entered an Order imposing travel restrictions on Washington and the Child during the pendency of this case. See Order (Doc. 15) at 2-3, entered November 5, 2014.

sympathetic court for custody hearings." See Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007). As such, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." See Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004). The Hague Convention "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." Seaman v. Peterson, 766 F.3d 1252, 1257 (11th Cir. 2014). A removal is "wrongful" within the meaning of the Hague Convention where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

See Convention, Art. 3. The petitioner bears the burden of establishing by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." See 22 U.S.C. § 9003(e)(1)(A). If a petitioner establishes a wrongful removal or retention, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention. See Convention, Art. 12; see also Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008).

To prevail on her Petition, Lövenich must prove that: (1) the Child was "habitually resident" in Germany at the time Washington removed him to the United States; (2) the removal was in breach of Lövenich's custody rights under German law, and (3) she had been exercising those rights at the time of removal.  See Ruiz, 392 F.3d at 1251.  The parties agree that the Child is under the age of sixteen, was born in Germany, and was habitually resident there until his removal on October 20, 2013.  Additionally, the parties do not dispute that they shared custody rights for the Child under German law and that Lövenich was regularly exercising those rights prior to the removal.  As such, Washington concedes, and the evidence presented at the Hearing confirms, that Lövenich has satisfied her burden of proof.  Thus, return of the Child is mandated under the Convention unless Washington can establish an affirmative defense.  See Baran, 526 F.3d at 1344.

**II.   Affirmative Defenses**

    **A.   Applicable Law**

As stated above, the Hague Convention provides certain affirmative defenses to the return of a child. Id. at 1344-45. "These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return." Id. at 1345. Two of the defenses require clear and convincing evidence:

> 1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms."

Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) (alteration in original) (quoting Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)).  The other two defenses may be established by a preponderance of the evidence:

> (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal.

Id. at 668-69.  In this case, Respondent relies solely on the defense of consent.  See Respondent's Trial Brief at 2.  Indeed, at the beginning of the Hearing, the parties specifically agreed that the sole issue in dispute for the Court to resolve is whether Lövenich gave her consent to Washington's removal of the Child.

"The consent defense involves the petitioner's conduct prior to the contested removal or retention . . . ."  See Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  This defense is distinct from acquiescence which "addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  Id.  Although the defense of "acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time,' . . . [c]onsent need not be expressed with the same degree of formality."  Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996)).  Both inquiries, however, turn on the subjective intent of the parent who is alleged to have consented or acquiesced.  Id.  In analyzing the consent defense, courts consider what the petitioner actually contemplated and agreed to, including the nature and scope of any consent given, and any conditions or limitations placed on that consent.  Id.

**B.     Discussion**

Lövenich and Washington met in Germany on February 14, 2009. A relationship developed between the two, and in the summer of 2010, Lovenich gave birth to the Child. The couple never married, and it is disputed whether they ever "lived together." However, the parties do agree that their respective residences in Germany were located across the street from each other. After his birth, the Child initially lived with Lövenich. On November 8, 2011, the parties signed a Certificate of Declaration of Parental Custody which states that the parties "wish to assume custody of our child jointly in future [sic]." See Hearing, Pet.'s Ex. 5, 5A. Nonetheless, the relationship between the parties eventually broke down and, at Washington's request, the German family court became involved in 2012.

Although the details are unclear, it appears Lövenich began having mental health problems following the death of her mother, which impacted her ability to care for herself and the Child. On June 19, 2013, the German family court entered an injunction, "without holding an oral hearing on grounds of urgency," transferring to Washington "[t]he right to determine the place of residence" of the Child. See id., Pet.'s Ex. 7, 7A. The German family court entered another order on August 13, 2013, setting forth an access arrangement which gave Lövenich the right and obligation to have the Child visit her every other weekend and on Wednesdays. Id., Pet.'s Ex. 1, 1A. The court explained that

> [t]he youth welfare office and the procedural adviser who had been appointed put forward the view that there were no indications of any kind of danger to the child when being looked after by his mother. However, the personal relationship between the child's parents was still extremely difficult, in particular with extreme differences in perceptions and memories as to individual circumstances.

Id. Despite this limited court-ordered visitation, both parties testified that Lövenich visited the Child almost every day, apparently without objection from Washington.

Lövenich last saw the Child in Germany on October 18, 2013. When Lövenich went to Washington's residence on October 20, 2013, she discovered that Washington and the Child were not there. Lövenich contacted Washington's friends, the social workers, family services, and the police. According to Lövenich, she learned of Washington's whereabouts in January 2014, when one of Washington's other children, Jermaine Washington, gave her Washington's address in Florida.[3] On February 28, 2014, Lövenich filed a motion with the German family court asking the court to award her sole parental custody for the Child based on Washington's removal of the Child to the United States. See Hearing, Pet.'s Ex. 3, 3A. Following an April 3, 2014 hearing at which Washington was not present and for which he claims to have received no notice, the German family court entered an order, on May 27, 2014, transferring sole parental custody to Lövenich. See Hearing, Pet.'s Ex. 8, 8A. On August 2, 2014, Lövenich signed a Request for Return document with Germany's Central Authority seeking the return of the Child pursuant to the Hague Convention. Id., Pet.'s Ex. 9, 9A. Lövenich maintains that she received no phone calls, letters or emails from Washington following the removal. According to Lövenich, the only contact she received from Washington was a text message on the day after the Child's birthday. She immediately called him in response to the text but Washington did not answer his cell phone and eventually turned the phone off. At the Hearing, Lövenich testified unequivocally that she

---

[3] Lövenich testified that she was unable to obtain this address from Jermaine Washington before January of 2014 because he initially refused to give it to her.

never discussed marriage with Washington, and never gave him permission to bring the Child to the United States without her.

Washington does not dispute that he took the Child to the United States on October 20, 2013.  However, according to Washington, this move was in accordance with a plan that he and Lövenich made together to relocate with the Child to the United States and get married.  Washington explained that although they planned to move to the United States together, Lövenich could not go because she had to wait to obtain her "visa."  Nonetheless, because Washington had primary custody of the Child and they both had passports,[4] Washington maintains that they agreed that Washington and the Child would go ahead and travel together to the United States and Lövenich would come later.  Washington states that he and Lövenich agreed it would be better for them to live in the United States with the Child because they and the Child were subjected to racist treatment in Germany.  Washington also asserts that he attempted to contact Lövenich multiple times when he reached the United States, even asking a friend in Germany to look for her, but was unable to make contact with her.[5]  Washington testified that when Lövenich did not follow him to the United States, he felt that he had been tricked into coming here with the Child so that Lövenich could obtain sole custody in his absence.  However, Washington explained that he did not return to Germany with the Child at that point because a friend informed him that he would be arrested.

---

[4] In May 2012, the parties obtained an American passport for the Child so that the three of them could travel to the United States to see Washington's mother who was very sick.  It appears that this trip never happened, and the relationship between the parties broke down soon after.  Lövenich testified that she did not have a passport at the time of the removal.

[5] Washington explains that he has no phone records evidencing these calls because he made them from telephone booths and used prepaid calling cards.

Upon careful consideration of all the evidence, the Court must find that Washington's testimony is not credible. First, Washington's assertion that the parties had decided to move to the United States together is undermined by his own admission that he told no one of this alleged plan to depart Germany. Washington attempted to explain this silence by testifying that he and Lövenich believed the German courts would attempt to keep them apart if the courts learned of their plans. However, this does not explain Washington's failure to inform his friends, or his four other children who live in Germany that he would be moving to the United States. Nor does it explain why Washington failed to notify his sister, Betty Mays, who lives in Jacksonville, Florida that he was planning to move to Jacksonville with Lövenich and the Child to live with her. Indeed, Mays testified that she did not know Washington was coming and was surprised to see Washington and the Child. Notably, Mays also stated that when she asked Washington upon his arrival about Lövenich, Washington told her that Lövenich was supposed to travel with them but had not done so, an explanation that is at odds with Washington's testimony that the plan was for Lövenich to come later.

Washington's testimony regarding the joint decision to allow the Child to travel to the United States is further undermined by his testimony that he bought the plane tickets only five days prior to his departure from Germany and that he left all of his belongings at his residence in Germany, having made no arrangements to collect that property. When questioned why he and the Child had to leave Germany so urgently, such that they could not wait for Lövenich to obtain her travel documents, Washington explained that Lövenich told him he had to be out of the country by October 21st or "they" would take the Child away from both of them. However, although he submitted other records from the German courts as

evidence, Washington points to no evidence to suggest that the German family courts had any plan to remove the Child from the shared custody of his parents and the Court does not find this testimony to be credible.  Moreover, to the extent Washington suggests that Lövenich gave her consent in order to "trick" Washington into leaving the country with the Child so that she could obtain sole custody in his absence, the Court is unpersuaded. Lövenich did not seek a transfer of custody until over three months after the removal, which suggests it was unlikely that obtaining sole custody in Washington's absence was her plan all along.  Additionally, Washington's only support for this version of events is the fact that he did not receive any notice of the April 2014 court proceedings.  However, court documents related to those proceedings show that Lövenich's German counsel did inform the German court of Washington's address in Florida and proposed that service be effected abroad on Washington at his Jacksonville, Florida address. Id., Pet.'s Ex. 4, 4A.  Whether Washington actually received this service or not, Lövenich's candid disclosure of his address to the German court seems inconsistent with Washington's theory that Lövenich's goal was to cause him to leave the country with the Child so that she could fraudulently obtain full custody in his absence.

Washington attempts to discredit Lövenich by asserting that she has a history of bizarre behavior, as well as a record of mental illness.  To this end, Washington submitted a Psychological Opinion prepared for the German family court in May 2013, in which the examiner found that it is "very likely [Lövenich] has an acute version of a schizophrenic episode." See id., Resp.'s Ex. 4 at 17. In addition, Washington testified that Lövenich hit the Child without cause, threatened Washington with a knife, and threw hot coffee on

Washington and the Child. However, even if these accusations are true,[6] they serve to further undermine Washington's story. It is difficult to reconcile Washington's descriptions of Lövenich's bizarre behavior and unstable personality with his statements that he planned to move to the United States with Lövenich and get married.[7] Indeed, the Psychological Opinion on which Washington relies, as well as the German family court orders, describe a highly contentious relationship between the parties. See id., Pet.'s Ex. 1, 1A at 2 ("[T]he personal relationship between the child's parents was still extremely difficult, in particular with extreme differences in perceptions and memories as to individual circumstances."); Pet.'s Ex. 7, 7A at 2 ("The disputes between the parents are posing a burden on the child."); Resp.'s Ex. 4 at 19 ("The special dynamics of this custody dispute derive from an extremely high potential for dispute between the parents of the child, which do not seem to take the child's interest much into consideration . . . ."). Moreover, Washington's description of Lövenich's inability to care for herself and the Child is at odds with a plan to leave her alone in Germany to obtain travel documents and make her way to the United States without assistance.

Further undermining Washington's testimony regarding the parties' reconciliation and joint plan to relocate to the United States together is his great dissatisfaction regarding the German family court's decision to allow Lövenich visitation rights. Washington testified that

---

[6] The Court has reason to doubt the extreme degree to which Washington portrays Lövenich's mental health problems given the German court's findings that she posed no threat to the Child, and Washington's own testimony that he allowed Lövenich to visit the Child far more frequently than required by the German courts.

[7] Although at the beginning of his testimony Washington stated that Lövenich's behavior improved after he obtained primary custody of the Child, leading to conversations about love and marriage, Washington later stated that her bizarre behavior continued even after the change in the Child's residence.

he felt the German court was discriminating against him, and that the German court system had intentionally failed to provide him with a copy of the order granting visitation to prevent him from appealing the decision.  It is difficult to understand why Washington would continue to harbor such a strong disagreement with the German family court's order granting visitation rights to Lövenich if the two had actually reconciled and intended to move to the United States together and marry.  Rather, Washington's testimony in this respect is more consistent with a person who felt he was not being treated fairly in the family courts of one country and sought out a more favorable forum.

Although much of what transpired in the relationship between Washington and Lövenich is unclear, it is apparent to this Court that both parents love and care deeply for the Child.  As such, the Court was hopeful when this case began that the parties could reach a resolution outside of Court that would secure the best interests of the Child.  Nonetheless, as attempts at compromise have failed, the Court is called upon to decide this matter within the limited confines of the Hague Convention.  Under these facts, because Lövenich has satisfied her prima facie case, the Court must order the Child's prompt return to Germany unless Washington has established by a preponderance of the evidence his affirmative defense of consent.  Having thoughtfully examined the evidence and testimony presented at the Hearing, the Court finds that Washington failed to meet his burden. The Court simply does not find credible Washington's testimony that Lövenich, who visited the Child nearly every day and had a highly volatile relationship with Washington, agreed to let him take the Child to the United States and leave her behind with no specific plans.  Rather, it appears that Washington, who was dissatisfied with the German family court's decisions and

frustrated with Lövenich's behavior, elected to suddenly and surreptitiously leave the country with the Child. While the parties previously may have discussed traveling to the United States together, or Lövenich may have encouraged Washington to visit the United States alone, for the reasons discussed above, the Court is convinced that Lövenich did not consent to Washington's October 2013 removal of the Child from Germany.

In light of the foregoing, the Court is compelled to order the prompt return of the Child to Germany. However, the Court must emphasize that Washington's great love for the Child is obvious. The Child appears to have received loving care during his time in the United States with Washington, to be thriving, and to have developed a strong paternal bond with his father. The Court is therefore hopeful that despite what transpired in the past, both Lövenich and Washington will put the best interest of the Child first, and come to an agreement that will allow the Child to continue to grow up knowing and benefitting from the love and presence of both of his parents.

Accordingly, it is

**ORDERED:**

1. Petitioner's Verified Petition for Return of Minor Child to Petitioner and Petition for Immeidate [sic] Issuance of Show Cause Order to Respondent (Doc. 1) is **GRANTED** as follows.

2. Respondent Clarence Victor Washington shall surrender custody of the Child, C.V.J.W., to Petitioner or her designee on or before **June 19, 2015**, for return to Germany. Counsel for Petitioner shall coordinate arrangements for the Child's surrender with counsel for Respondent.

3. The Clerk of the Court is directed to immediately release the Child's passport to Petitioner or her counsel so that the Child may travel to Germany.

4. Petitioner shall have up to and including **June 26, 2015**, to file any motion to recover necessary expenses incurred in this action pursuant to 22 U.S.C. § 9007(b)(3).[8]

5. The Clerk is further directed to enter judgment accordingly, terminate all pending motions as moot, and close the case.

**DONE AND ORDERED** in Jacksonville, Florida on June 11, 2015.

*[signature]*
MARCIA MORALES HOWARD
United States District Judge

lc11

Copies to:

Counsel of Record

---

[8] Pursuant to 22 U.S.C. § 9007(b)(3):

> [a]ny court ordering the return of a child pursuant to an action brought under section [9003] of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

While the Court understands that the attorneys represented the parties in this case pro bono such that an award of legal fees is not warranted, Petitioner may seek to recover her necessary costs and expenses, including the transportation costs related to the return of the Child.